**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-13-CR-1726(18)-KC** |
| | § | |
| **SALLY MENA-BARRAZA,** | § | |
| | § | |
| **Defendant**. | § | |

## <u>ORDER</u>

On this day, the Court *sua sponte* considered the above-captioned case (the "Case").

After discovering inconsistencies in Defendant's financial disclosures, the Court, on its own

motion, held an evidentiary hearing on the following two issues arising under the Criminal

Justice Act ("CJA"), 18 U.S.C. § 3006A:  (1) whether Sally Mena-Barraza ("Defendant")

remains eligible for court-appointed counsel during the pendency of her appeal, and (2) whether

Defendant possesses the present financial ability to reimburse the government for the costs of her

legal defense.  After careful consideration, the Court finds that Defendant is not, nor has she ever

been, eligible for free legal services under the CJA.  However, as explained in more detail below,

because the Court is of the opinion that terminating Defendant's counsel at this late stage in the

proceedings would create more problems than it would solve, the Court instead orders Defendant

to reimburse the government for the total costs of her legal defense in this Case.  These costs

include (1) the $20,485.60 in attorney's fees that the government expended to fund Defendant's

defense at trial, (2) the $3,770.45 fee Defendant incurred when she ordered the trial transcript,

and (3) the $10,000.00 in attorney's fees that Defendant's counsel estimates Defendant will incur

on appeal.[1]

I.    **BACKGROUND**

A.    **Procedural Posture**

On August 7, 2013, a federal grand jury charged Defendant with two counts in a thirteen-count indictment naming nineteen separate defendants stemming from the government's investigation into a drug trafficking organization led by Manuel Velasquez.  *See* Redacted Indictment, ECF No. 81.  Defendant was charged with (1) conspiracy to possess marijuana with intent to distribute pursuant to 21 U.S.C. § 846, and (2) conspiracy to launder monetary instruments pursuant to 18 U.S.C. § 1956(h).  *Id.*

Shortly after her arrest, Defendant filled out and signed a CJA 23 financial affidavit form in connection with her request for court-appointed counsel.  *See* Financial Aff., ECF No. 154. When prompted to list all "real estate, stocks, bonds, notes, automobiles, or other valuable property," the sole asset Defendant disclosed was a 1999 Toyota 4Runner valued at $4,000.00. *Id.*  Defendant also referred to a "home" in a subsequent portion of her affidavit, but did not indicate its address or provide an approximate value for the property.  *See id.*  Based upon these representations, United States Magistrate Judge Miguel A. Torres concluded that Defendant was unable to afford an attorney, and therefore appointed a member of the CJA panel to act as her counsel.  *See* ECF No. 165.

The Case proceeded to trial on September 26, 2014, where the government tried Defendant separately from all co-defendants.  On October 2, 2014, the jury found Defendant not guilty of conspiracy to possess marijuana with intent to distribute, but guilty of conspiracy to launder monetary instruments.  *See* Verdict Form, ECF No. 707.

---

[1] As noted below, if Defendant's appellate costs ultimately exceed her counsel's $10,000.00 estimate, Defendant may file a motion with this Court explaining why her then-current financial circumstances prevent her from repaying the excess amount.

On December 18, 2014, the Court sentenced Defendant to a term of five years of probation and six months of home confinement. *See* J. in a Criminal Case 2, ECF No. 812. The Court further imposed a $2,000.00 fine, and a $100.00 special assessment. *Id.* at 5. On December 23, 2014, Defendant filed a Notice of Appeal, ECF No. 814. She continues to be represented by her court-appointed counsel as of the date of this Order.

Shortly after sentencing, it came to the Court's attention that there were significant discrepancies between the financial information contained within Defendant's CJA 23 form and that contained within her Presentence Investigation Report ("Presentence Report"), ECF No. 798. Most significantly, the Court discovered that Defendant possessed a partial or full ownership interest in *three* separate real properties, two of which Defendant did not disclose when she initially requested court-appointed counsel.

Upon discovering these discrepancies, on February 20, 2015, the Court issued its Notice of Hearing and Order to Show Cause (the "Show Cause Order"), ECF No. 862. By the Show Cause Order, the Court scheduled an evidentiary hearing to determine whether Defendant remained eligible for court-appointed counsel on appeal, and whether Defendant had available funds to reimburse the government in whole or in part for the substantial costs of her legal defense in this Case. *See* Show Cause Order 2. In preparation for the evidentiary hearing, the Court ordered Defendant to submit a legal memorandum that included "a detailed accounting of Defendant's present financial circumstances, including all income, assets, and outstanding financial liabilities." *Id.*

On March 17, 2015, Defendant filed her "Response to Show Cause Order and Brief in Support" (the "Response"), ECF No. 878. On March 30, 2015, the government filed its

"Response to Defendant's Show Cause Response," ECF No. 882.[2]

### B.   Defendant's Pre-Hearing Financial Summary

Before recounting the testimony from the evidentiary hearing, the Court briefly summarizes Defendant's pre-hearing representations regarding her financial condition.  In the Response, Defendant claimed that her sole source of income was the $1,000.00 per month that she earns as a self-employed notary public and legal document preparer.  *See* Resp. 1.  Defendant further stated that her husband is unemployed, and identified their total monthly expenses at $965.00.  *See id.* at 1-2.  Defendant also listed $3,941.00 in miscellaneous unpaid bills, $1,984.00 in unpaid property taxes, and a $2,000.00 pending court fine in connection with her criminal conviction.  *See id.* at 2.

With respect to her current assets, Defendant identified interests in three separate real properties, all located in El Paso, Texas.  *See id.* at 1-2.  First, Defendant stated that she and her husband are the sole owners of a home located at 5009 Haynesworth Avenue (the "Haynesworth Property"), which Defendant valued at $87,063.00.  *Id.* at 1.  Second, Defendant stated that she and her five siblings all own a one-sixth interest in a home located at 451 Chapel Place (the "Chapel Property"), the total value of which Defendant estimated at $51,509.00.  *Id.* at 2.[3]  And third, Defendant stated that she and her older brother, Manuel Barraza, are joint owners of a property located at 212 Wooldridge Drive (the "Wooldridge Property"), which Defendant valued at $79,144.00.  *Id.*  In addition to these three homes, Defendant reported owning two vehicles collectively valued at $4,500.00.  *Id.* at 1.

While the sole purpose behind requiring Defendant to file a Response was to obtain

---

[2] Although the Court found the government's briefing helpful in preparing its questions for the evidentiary hearing, it is not relevant to the instant Order, and thus the Court does not discuss it further here.

[3] Defendant's exact words were that she owned the Chapel Property "jointly with, Irma Barraza, Nicolas Barraza, John Barraza, Manuel Barraza and Paul Barraza."  Resp. 2.

4

accurate and complete financial information in advance of the April 2, 2015, evidentiary hearing, the Court later learned that, much like Defendant's previous financial disclosures, her financial representations in the Response were neither accurate nor complete.  Most significantly for the purposes of the instant Order, Defendant's representations in the Response regarding her relative ownership interests in the Chapel Property and the Wooldridge Property were inconsistent with her own sworn testimony at the hearing.

### C.      The Evidentiary Hearing

In accordance with the Show Cause Order, the Court held an evidentiary hearing on April 2, 2015.  Three witnesses testified at the hearing, including Defendant.  The Court summarizes each witness's testimony below.

Pretrial Services Officer Steven Gabaldon was the first witness to testify.  *See* Apr. 2, 2015, Hr'g Tr. 5-16 ("Transcript"), ECF No. 892.  Mr. Gabaldon was the officer assigned to supervise Defendant on pretrial release after she was convicted and while awaiting sentencing. *Id.* at 6.  According to Mr. Gabaldon, pretrial services first interviewed Defendant on August 16, 2013.  *Id.* at 7.  The purpose of the interview was to determine Defendant's eligibility for court-appointed counsel and pretrial release on bond.  *Id.*  In that vein, once Defendant requested appointment of counsel, pretrial services asked her a series of questions regarding her financial condition.  *See id.*

Mr. Gabaldon summarized Defendant's representations in her CJA 23 form as follows: Defendant stated that she was a self-employed notary public earning $1,000.00 per month in income, and that her common law husband was also employed and contributing $1,500.00 per month to the household.  *Id.* at 8.  Defendant indicated that she had no cash on hand, and no other sources of income.  *Id.*  She further indicated that her only assets were her homestead and a

1999 Toyota 4Runner valued at approximately $4,000.00.  *Id.*  Finally, Defendant stated that her monthly expenses were approximately $1,000.00, and claimed her adult son, Joseph, and adult daughter, Kristin, as dependents.  *Id.* at 8-9.

Following Defendant's initial interview, Mr. Gabaldon testified that pretrial services conducted an independent investigation into Defendant's background for the purpose of making a recommendation to the Court as to whether Defendant should be granted a bond, and if so, in what amount.  *Id.* at 10-11.  It was during the course of this investigation that pretrial services discovered the existence of the Chapel Property, which Defendant did not disclose during her August 16, 2013, interview.  *Id.* at 12.  According to Mr. Gabaldon, the El Paso County Central Appraisal District listed the value of the Chapel Property at $51,509.00.  *Id.*

The Court ultimately released Defendant on a $20,000.00 signature bond.  *See* Release Order, ECF No. 216.  While on pretrial release, Mr. Gabaldon testified that Defendant reported an increase in income sometime around April 2014.  *See id.* at 13-14.  Specifically, Defendant allegedly reported that her income had increased from $1,000.00 per month to between $300.00 and $1,000.00 per week.  *Id.*  According to Mr. Gabaldon, "each month that [Defendant] came in," pretrial services requested that she provide "some kind of written form" documenting her income.  *Id.* at 14.  Though Mr. Gabaldon did not personally take over Defendant's supervision until October 2014, he testified that the case file does not contain any indication that Defendant ever produced documentation verifying the extent of her monthly income.  *Id.* at 15.

The Court next heard testimony from United States Probation Officer Miriam Guillen.  *See id.* at 15-25.  Ms. Guillen was the probation officer assigned to prepare Defendant's Presentence Report.  *Id.* at 16-17.  As part of this process, Ms. Guillen testified that she conducted an interview with Defendant on October 14, 2014, which included questions relating

to Defendant's then-current financial circumstances.  *Id.* at 17.  According to Ms. Guillen, Defendant stated that she was still self-employed as a notary public, but that her income had decreased since her conviction.  *Id.* at 18.  Specifically, Defendant claimed that her income fluctuated from $500.00 to $1,000.00 per month.  *Id.*  Defendant further indicated that her husband had lost his job shortly after she was arrested, and that he was unable to obtain a new position due to an injury he had suffered many years before.  *Id.*

Ms. Guillen also inquired into Defendant's assets, including the two homes contained within the Pretrial Services Investigation Report.  *Id.*  According to Ms. Guillen, Defendant reiterated that the Haynesworth Property was her primary residence, and that she owned the home outright.  *Id.*  Defendant further indicated to Ms. Guillen that she owned the Chapel Property jointly with her other five siblings.  *Id.* at 19.  Finally, in addition to the 1999 Toyota 4Runner that Defendant had already disclosed to pretrial services, Defendant told Ms. Guillen for the first time that she also owned a 2000 Chevrolet Blazer.  *Id.*

Following the interview, Ms. Guillen attempted to corroborate Defendant's representations regarding her financial condition.  *Id.* at 20-21.  First, Ms. Guillen ran a credit report, which indicated that Defendant had various debts totaling $3,941.00, all of which were in collection.  *Id.* at 21-22.  Second, Ms. Guillen also conducted a public records search on the LexisNexis database.  *Id.* at 22.  According to Ms. Guillen, this search revealed for the first time that Defendant owned an interest in a *third* home, which the Court now understands to be the Wooldridge Property.  *Id.* at 22-23.[4]  Ms. Guillen testified that the Wooldridge Property was appraised at a value of $79,144.00, and her investigation indicated that the home was fully paid

---

[4] One of Defendant's brothers, Nicolas Barraza, is listed in the El Paso County Central Appraisal District as the primary homeowner of the Wooldridge Property.  *See* Tr. 23.  As a result, when pretrial services conducted a "name search" in the El Paso County Central Appraisal District website, the Wooldridge Property did not initially appear under Defendant's name.  *Id.*

for.  *Id.* at 24.  When Ms. Guillen contacted Defendant regarding the existence of the Wooldridge

Property, Defendant admitted that she was one of the owners of the home, but characterized the

property as a "family residence."  *Id.* at 23.

After Ms. Guillen's testimony, the Court had the opportunity to question Defendant

directly regarding the current status of her finances.  *See id.* at 25-75.  The Court first inquired

into Defendant's household income and the circumstances surrounding her notary business.  *Id.*

at 26.  Defendant testified that she currently conducts anywhere from $900.00 to $1,300.00

worth of business per month, the vast majority of which is transacted in cash.[5]  *Id.* at 26-28.

Defendant testified that she does not maintain a separate business bank account, and instead pays

all of her expenses, both business and personal, from a single checking account.  *Id.* at 41-44, 45-

46.  Defendant further testified that since January 2015, she has operated the notary business out

of a location that does not require her to pay any rent.  *Id.* at 40.  According to Defendant, her

husband has been unemployed since August 2013, and is currently unable to make any

contributions to the household income.  *Id.* at 35-37.  In addition, Defendant reported less than

$100.00 in her checking account, and approximately $25.00 in her savings account.  *Id.* at 46, 72.

The Court next inquired into Defendant's interest in the Haynesworth Property.  *See id.* at

37-39, 51-53.  Defendant testified that the Haynesworth Property is her actual homestead, and is

the only one of the three homes in which she has an ownership interest that she and her husband

purchased.  *Id.* at 51.  Defendant testified that both she and her husband are listed on the title to

the residence, *id.*, and indicated that their twenty-nine year old daughter, Kristin, also currently

resides in the home.  *Id.* at 37-38.  Defendant testified that her daughter has a master's degree,

and is presently employed with the Department of Justice.  *Id.*  Defendant explained that her

---

[5] Defendant expressly denied ever reporting her income to pretrial services as $300.00 to $1,000.00 per week.  *See* Tr. 28.

daughter pays for the family car insurance, DirecTV, and Internet, but otherwise lives in the home rent free. *Id.* at 38-39, 71. According to Defendant, the Haynesworth Property is valued at approximately $87,000.00. *Id.* at 51-52. Although the home is fully paid for, Defendant indicated that she is approximately $1,984.00 behind on the property taxes for the Haynesworth Property. *Id.* at 52.

The Court next inquired into Defendant's ownership interest in the Chapel Property. *See id.* at 53-61. According to Defendant, her father originally purchased the Chapel Property in 1994, but placed the residence solely in Defendant's name. *Id.* at 53-54. Defendant testified that the only reason her father listed her as the title owner is because she originally loaned him $10,000.00 to help finance the purchase. *Id.* at 54. Defendant explained that while her father paid her back the entire loan amount, the Chapel Property remains solely in her name to this day. *Id.* Nevertheless, Defendant testified that she does not, nor has she ever, considered herself the "owner" of the Chapel Property. *Id.* at 55-59. Indeed, according to Defendant, she intends to deed the home over to her older brother, Manuel Barraza, pursuant to the wishes of her late father. *Id.* at 53, 55, 57. Currently, Defendant's niece, Flor Barraza, lives in the Chapel Property with her husband. *Id.* at 57. Flor Barraza does not pay Defendant any rent, and while Flor Barraza is technically responsible for the property taxes, Defendant indicated that her niece has not paid any of the taxes for the last two years. *Id.* at 57-58. As a result, Defendant testified that she also owes approximately $4,000.00 in back taxes on the Chapel Property. *Id.* at 58. Defendant testified that the Chapel Property is valued at approximately $51,000.00, and is not encumbered by any mortgage. *Id.* at 53, 56.

The Court also attempted to clarify Defendant's legal interest in the Wooldridge Property. *See id.* at 61-65. According to Defendant, the Wooldridge Property was originally her

parent's home. *Id.* at 61. As a result, Defendant testified that she and her five siblings all consider themselves joint owners. *Id.* Nevertheless, Defendant indicated that only four of the siblings – Nicolas Barraza, John Barraza, Irene Barraza, and Defendant – are listed as title owners. *Id.* Defendant testified that her youngest brother, Paul Barraza, currently lives in the Wooldridge Property. *Id.* at 62-63. While Paul Barraza pays the taxes and utilities, he does not pay the four title owners any rent. *Id.* at 63-64. Defendant indicated that Paul Barraza is currently employed as a real estate broker. *Id.* at 65. According to Defendant, the Wooldridge Property is valued at approximately $79,000.00. *Id.* at 61.

After attempting to clarify Defendant's relative ownership interests in the three homes, the Court specifically asked Defendant whether she ever discussed with her siblings the need to sell one or more of the properties in order to fund her legal defense in this Case. *Id.* at 65-67. According to Defendant, some of her siblings were against selling or encumbering the properties. *Id.* at 66-67. While Defendant testified that she is the sole title owner of the Chapel Property, it is unclear whether any of the dissenting siblings are owners of the Wooldridge Property. *See id.*

Finally, the Court asked Defendant about her efforts to obtain private counsel following her arrest in August 2013. *See id.* at 73-75. Defendant testified that one experienced criminal defense attorney came to see her shortly after her arrest and offered to take on the Case for $3,000.00. *Id.* at 73. According to Defendant, she declined to retain the attorney in question because she "couldn't even pay that." *Id.* Defendant also testified that her family reached out to two other criminal defense lawyers, but one could not take the Case because he was ill, and the other failed to appear for Defendant's arraignment. *Id.* at 74. Defendant admitted, however, that although she worked as a legal secretary for many years and knows several attorneys in the community, she did not personally make any effort to retain private counsel. *Id.* at 75.

## II.   DISCUSSION

### A.   Standard

Under the CJA, when a district court determines that a criminal defendant is "financially unable" to obtain legal counsel, the court must appoint counsel at the government's expense unless the defendant knowingly and voluntarily elects to proceed pro se.  *See* 18 U.S.C. § 3006A(b); *see also* U.S. Const. amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) (recognizing the "obvious truth" that "any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for [her]").  However, in situations where a defendant is financially able to pay for counsel, there is no requirement – constitutional or otherwise – that the government pay for a defendant's legal defense.  *United States v. Lorenzini*, 71 F.3d 1489, 1493 (9th Cir. 1995).  Indeed, "[r]equiring defendants who can do so to pay for the costs of their defense is an elementary part of the way the criminal justice system operates in this nation."  *Id.*; *see also United States v. Parker*, 439 F.3d 81, 109 (2d Cir. 2006) (noting that "CJA funds are a necessarily limited resource" and the public has a "strong interest in how its funds are being spent in the administration of criminal justice") (internal quotation marks and citation omitted).

In this vein, "[w]hat the [CJA] gives with one hand to a criminal defendant 'financially unable' to pay for legal services it takes away with the other if the defendant turns out to be 'financially able' to obtain counsel."  *United States v. Wilson*, 597 F.3d 353, 357 (6th Cir. 2010).  In particular, § 3006A(c) of the CJA states that "[i]f at any time after the appointment of counsel the United States magistrate judge or the court finds that the person is financially able to obtain counsel," the court "may terminate the appointment of counsel . . . as the interests of justice may dictate."  18 U.S.C. § 3006A(c).  Section 3006A(f) further provides that "[w]henever the United

States magistrate judge or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid . . . to the court for deposit in the Treasury as a reimbursement." *Id.* § 3006A(f); *see also id.* § 3006A(c) (noting that if a defendant is ultimately found ineligible, a court may "authorize payment as provided in subsection (f), as the interests of justice may dictate"). Thus, in sum, the CJA "gives district courts authority to terminate an appointment of counsel *and* to require the defendant to pay for services provided." *Wilson*, 597 F.3d at 357.

A court's decision to terminate a defendant's eligibility for court-appointed counsel or to require reimbursement is not one that should be reached lightly. *Id.* at 357-58. "A thorough inquiry into the defendant's finances, though not [necessarily] a full adversarial hearing, should precede any such order." *Id.* at 358; *see also United States v. Fincher*, 538 F.3d 868, 876 (8th Cir. 2008) ("*Fincher I*") (noting that "a 'full inquiry' into the defendant's actual ability to retain counsel" is required before the court orders reimbursement); *United States v. Foster*, 867 F.2d 838, 841 (5th Cir. 1989) (noting that district courts must make an "appropriate inquiry" into a defendant's financial status before determining eligibility under the CJA). The defendant ultimately bears the burden of establishing that she is unable to pay for the costs of legal representation. *See Foster*, 867 F.2d at 841; *see also United States v. Konrad*, 730 F.3d 343, 346 (3d Cir. 2013); *United States v. Fincher*, 593 F.3d 702, 705 (8th Cir. 2010) ("*Fincher II*"); *United States v. Murphy*, 469 F.3d 1130, 1135 (7th Cir. 2006); *Parker*, 439 F.3d at 93, 96; *United States v. Owen*, 407 F.3d 222, 226 (4th Cir. 2005); *United States v. Barcelon*, 833 F.2d 894, 896 (10th Cir. 1987); *United States v. Ellsworth*, 547 F.2d 1096, 1098 (9th Cir. 1976).

As the Second Circuit has observed, there are "no precise rules defining when a defendant is financially unable to obtain an adequate defense." *Parker*, 439 F.3d at 97 (internal

quotation marks and citation omitted).  Indeed, the CJA Guide to Judiciary Policy simply states that a person is eligible for court-appointed counsel when "the person's net financial resources and income are insufficient to obtain qualified counsel."  7A *Guide to Judiciary Policy* § 210.40.30(a) (the "Guide").  Nevertheless, it is clear that the standard for eligibility under the CJA is "something less than indigency or destitution."  *United States v. Harris*, 707 F.2d 653, 660 (2d Cir. 1983); *accord Fincher II*, 593 F.3d at 705 ("[F]inancial inability to pay does not mean indigence or destitution."); *Parker*, 439 F.3d at 96 (same); *Foster*, 867 F.2d at 839 (same).  The Guide expressly instructs courts to consider "the cost of providing the person and [her] dependents with the necessities of life."  *See* Guide § 210.40.30(a)(1); *see also Harris*, 707 F.2d at 661 (noting that a court should "explicitly consider [a defendant's] ability to afford counsel in light of economic realities," including "the cost of a criminal defense and the cost of providing for [herself] and dependents").  In addition, a court's eligibility determination must focus on a defendant's present financial condition, and current ability to pay.  *See United States v. Jimenez*, 600 F.2d 1172, 1174 (5th Cir. 1979) (observing that § 3006A is written in the present tense).

The standard for determining the appropriateness of a reimbursement order is similarly broad.  A court should not order reimbursement without first finding that funds are "available for payment" within the meaning of § 3006A(f).  *See* 18 U.S.C. § 3006A(f); *see also, e.g.*, *United States v. Moore*, 666 F.3d 313, 322 (4th Cir. 2012) ("[T]he statute clearly requires a *finding* of a defendant's ability to make payments as a condition precedent to an order of reimbursement.").  An asset is considered "available" when the defendant "has control over or discretionary use of them."  *Konrad*, 730 F.3d at 347 (citing *Fullan v. Comm'r of Corr.*, 891 F.2d 1007, 1011 (2d Cir. 1989)).  The Guide instructs courts to "consider pertinent information contained in the presentence report, the court's intention with respect to fines and restitution, and all other

13

available data bearing on the person's financial condition."  *See* Guide § 210.40.30(d).

Additionally, before ordering reimbursement, "the district judge should be satisfied that . . . the

defendant will not suffer extreme hardship as a consequence of being deprived of [her] funds."

*United States v. Bracewell*, 569 F.2d 1194, 1199 (2d Cir. 1978); *accord Museitef v. United

States*, 131 F.3d 714, 716 (8th Cir. 1997) ("The test is whether repayment would cause such

financial hardship as to make it impractical or unjust.").  In sum, the district court must

undertake "a pragmatic inquiry" as to "whether it is fair to make the defendant pay for counsel

after the fact."  *Wilson*, 597 F.3d at 359.

### B.      Analysis

Defendant's failure to timely and accurately disclose her financial assets raises two

related issues for the Court's consideration.  *See* Show Cause Order 2.  First, as a threshold

matter, the Court must determine whether Defendant's current financial assets render her

ineligible for appointed counsel, and, if so, whether pragmatic considerations nevertheless weigh

against terminating Defendant's current counsel on appeal.  Second, the Court must determine

whether Defendant presently has assets available to repay the government for all or some of the

costs of her legal defense.  The Court addresses each of these points in turn.

### 1.      Defendant's eligibility under the CJA

As noted above, Defendant's representations to the Court regarding her financial

condition have changed at nearly every successive stage of this Case.  Setting aside the fact that

Defendant did not even disclose the existence of the Chapel Property and the Wooldridge

Property when she made her initial request for court-appointed counsel, Defendant's sworn

testimony at the hearing directly contradicted her own pre-hearing representations in two

significant ways.  First, while Defendant claimed in the Response that she owns the Chapel

14

Property "jointly with, Irma Barraza, Nicolas Barraza, John Barraza, Manuel Barraza and Paul Barraza," Resp. 2, she testified at the hearing less than three weeks later that the Chapel Property is "only under [her] name." Tr. 55. Similarly, while Defendant represented to the Court in her Response that she owns the Wooldridge Property "jointly with Manuel Barraza," Resp. 2, her testimony at the hearing was that the Wooldridge Property "really belongs to the six of us" but "it's in four of the names." Tr. 61.[6]

Because Defendant bears the burden of establishing her financial inability to obtain counsel, *see Foster*, 867 F.2d at 841, she has the "responsibility of providing the court with sufficient and accurate information upon which the court can make an eligibility determination." *See* Guide § 210.40.20(f). Defendant's failure to meet this obligation and the repeated inconsistencies in the information she has provided raise serious concerns regarding her overall credibility. Indeed, other courts have denied CJA counsel to defendants that have provided similarly inaccurate, incomplete, or evasive explanations regarding their financial circumstances. *See Barcelon*, 833 F.2d at 897 n.5 (collecting cases).

Here, in spite of Defendant's fragmented financial disclosures, the Court has enough information to find that Defendant is *not* eligible for free legal services under the CJA. According to Defendant's sworn testimony, she possesses a full or partial ownership interest in three different homes located in El Paso, Texas.[7] First, Defendant owns an undivided one-half interest in the Haynesworth Property, which is valued at $87,063.00. Second, Defendant is the

---

[6] Defendant's conflicting explanations regarding her ownership interests in the Chapel Property and the Wooldridge Property are not the only inconsistencies between her Response and her sworn testimony. For example, though Defendant represented in the Response that she sets aside $195.00 per month to pay her property taxes on the Haynesworth Property, *see* Resp. 2, she testified at the hearing that she "never said that" and in fact does not use any portion of her monthly income to pay outstanding property taxes. *See* Tr. 52-53.

[7] In analyzing Defendant's relative ownership interests in the Chapel Property and the Wooldridge Property, the Court credits Defendant's sworn testimony at the evidentiary hearing over her unsworn representations in the Response. However, given Defendant's history with nondisclosure, partial disclosure, and reluctant disclosure of her assets, the Court would not be surprised to learn that Defendant is the owner of other undisclosed assets.

sole title owner of the Chapel Property, which is valued at $51,509.00. And third, Defendant

owns a one-fourth interest in the Wooldridge Property, which is valued at $79,144.00. When the

Court adds Defendant's relative interests in the three properties to the value of the 1999 Toyota

4Runner and the 2000 Chevrolet Blazer (collectively, valued by Defendant at $4,500.00), the

Court concludes that Defendant has approximately $119,326.50 in total assets. After taking into

account Defendant's $3,941.00 in miscellaneous debts, $1,984.00 in outstanding property taxes

on the Haynesworth Property, $4,000.00 in outstanding property taxes on the Chapel Property,

and the $2,000.00 fine associated with Defendant's criminal conviction, the Court finds that

Defendant's assets exceed her liabilities by approximately $107,401.50.

Despite her substantial assets, Defendant raises several arguments as to why this Court

should still find her eligible for free legal services under the CJA. First, Defendant contends that

she does not "own" the Chapel Property because her late father asked her to eventually deed the

home over to her older brother, Manuel Barraza. *See* Tr. 54-59. This contention is meritless.

While Defendant may sincerely view the Chapel Property as belonging to her brother, *see id.*, the

Court must base its eligibility decisions on legal realities, not Defendant's subjective notion of

ownership. Here, Defendant testified repeatedly that the Chapel Property is "just in [her] name,"

and in fact "was always in [her] name." *Id.* at 54; *see also id.* at 55-56. As a result, Defendant is

the sole owner of the Chapel Property, and she therefore has the right to sell, rent, or encumber

the home at her discretion.

Defendant next argues that the Court should ignore her ownership interest in the

Wooldridge Property because it "cannot be liquidated without the acquiescence of the co-

owners." *See* Resp. 3. However, in Texas, "[i]t is unquestionably true that a joint owner of real

estate has a right to either sell or mortgage [her] interest in the property without either the

16

knowledge or consent of [her] co-owner." *Shear Co. v. Lucas*, 276 S.W. 935, 936 (Tex. Civ. App. 1925); *see also City of Plano v. Hale*, No. 05-92-01732-CV, 1993 WL 175208, at *4 (Tex. App. May 26, 1993) ("As a matter of right, each cotenant may sell, encumber, lease, or otherwise convey his undivided interest in the common property without the consent of his cotenants."). Though the Court acknowledges that the market for a one-fourth interest in an El Paso home shared by siblings is likely limited, there is no indication that Defendant ever attempted to use her interest in the Wooldridge Property to in some way raise funds to pay for her defense.[8]

Finally, Defendant argues that the properties in question "generate no income" because they are "not rental properties." *See* Resp. 3. This is, however, a problem "of [Defendant's] own making." *United States v. Thomas*, 630 F. Supp. 820, 822 (E.D. Mich. 1986), *aff'd*, 815 F.2d 81 (6th Cir. 1987). Defendant allows her niece and her niece's husband to live in the Chapel Property rent free, despite the fact that they have not paid taxes on the home for the last two years. *See* Tr. 57-59. Defendant allows her brother to live in the Wooldridge Property rent free, despite the fact that he currently works as a real estate broker. *Id.* at 62-65. Finally, Defendant allows her twenty-nine year old daughter to live in the Haynesworth Property largely rent free,[9] despite the fact that she has a master's degree and currently works for the department of justice. *Id.* at 37-39. Although Defendant is certainly permitted to make her own financial choices, the government is not required to subsidize those choices by paying Defendant's legal fees.

Nevertheless, the Court's finding that Defendant is financially able to afford counsel does

---

[8] While Defendant argues that a bank would be "unlikely" to issue her a loan given her "current financial condition and credit rating," *see* Resp. 5, there is no indication that Defendant even attempted to contact a single bank, let alone evidence that a bank refused her on the basis of poor credit. Because Defendant has the burden of establishing her eligibility under the CJA, *see Foster*, 867 F.2d at 841, and because the Court gave Defendant every opportunity to present evidence at the April 2, 2015, evidentiary hearing, her assertion that a bank would be "unlikely" to issue her a loan is baseless, and therefore wholly insufficient to establish her financial inability to obtain counsel.

[9] Defendant testified that while her daughter does not pay rent, she assists Defendant with some expenses, including Internet, DirecTV, and car insurance. *See* Tr. 38-39, 71.

not necessarily mean that it should terminate Defendant's counsel prospectively on appeal.

Section 3006A(c) of the CJA specifically provides that a court "*may* terminate the appointment

of counsel or authorize payment as provided in subsection (f), *as the interests of justice may*

*dictate*." 18 U.S.C. § 3006A(c) (emphasis added).  "Deciding whether to remove counsel after

appointment, as distinguished from deciding whether to initially appoint counsel, raises unique

problems and concerns for a court."  *United States v. Zelenka*, 112 F. Supp. 2d 708, 717 (M.D.

Tenn. 1999).  As a result, "the language of the CJA affords significant discretion to courts in

deciding whether the interests of justice will be met by removing court-appointed counsel."  *Id.*

   Here, the Court finds that the interests of justice weigh against terminating Defendant's

court-appointed counsel.  As an initial matter, Defendant's case is a complicated one, involving

nineteen separate defendants and a trial that included almost a full week of testimony.

Defendant's current counsel is familiar with the trial record, and the Court understands that he

has already expended substantial resources preparing Defendant's appeal.  It would serve neither

Defendant nor the interests of judicial efficiency for the Court to terminate Defendant's counsel

at this late stage in the proceedings.

   Moreover, though the Court maintains at least some degree of skepticism that Defendant

has disclosed the full extent of her assets and income, the assets that Defendant has disclosed are

primarily illiquid in nature.  As a result, it would likely take time for Defendant to generate

sufficient cash to satisfy a private retainer agreement, and Defendant would, at least in the

interim, be without counsel on appeal.  Accordingly, out of an abundance of caution, the Court

declines to terminate Defendant's court-appointed counsel despite her substantial assets.  *See*

*Barcelon*, 833 F.2d at 897-98 (noting that "where the bare listing of the applicant's financial

position discloses marginal liquidity," a court should consider appointing counsel and requiring

defendant to repay in whole or in part the costs of her legal defense); *Wade v. Lockhart*, 763 F.2d 999, 1001 (8th Cir. 1985) (holding that a defendant's one-third interest in 182 acres of land did not automatically defeat his claim for appointed counsel on appeal where the defendant represented to the trial court that he could not obtain any benefit from the property for several months); *United States v. Coniam*, 574 F. Supp. 615, 617 (D. Conn. 1983) (denying government's motion to terminate CJA counsel without prejudice where the evidence demonstrated that the defendant did not presently have the necessary cash to pay a retainer).

### 2. Appropriateness of a reimbursement order

Having determined that CJA counsel should continue to represent Defendant on appeal, the Court must now decide whether Defendant has funds available to bear some or all of the costs of her legal defense. In particular, the Court must determine whether "there are specific funds, assets, or asset streams (or the fixed right to those funds, assets or asset streams) that are (1) identified by the court and (2) available to the defendant for the repayment of the court-appointed attorneys' fees." *Moore*, 666 F.3d at 322. As noted above, Defendant possesses three assets of substantial value – namely, her ownership interests in the Haynesworth Property, the Chapel Property, and the Wooldridge Property. Thus, placed within the context of this Case, the question is whether any of these properties is presently "available" within the meaning of § 3006A(f), and whether requiring Defendant to use one or more of these properties to pay for the costs of her legal defense "would cause such financial hardship as to make it impractical or unjust." *Museitef*, 131 F.3d at 716; *accord Bracewell*, 569 F.2d at 1199.

The liquidity of a defendant's assets is relevant in determining whether funds are "available" under § 3006A(f). *Konrad*, 730 F.3d at 347-48; *Museitef*, 131 F.3d at 716. Nevertheless, "availability is not limited only to currently liquid assets at the time reimbursement

is ordered." *Moore*, 666 F.3d at 324. To the contrary, "a repayment order may be based on identified funds and assets, even if those assets will not become liquid until a future date." *Id.*; *accord Konrad*, 730 F.3d at 348 ("'In some cases, liquidation of assets may be required.'" (quoting *Barry*, 864 F.2d at 299)).

With these considerations in mind, the Court first discusses the status of the Haynesworth Property. Jointly held assets, including real estate, are the proper subject of a reimbursement order so long as the defendant has the requisite discretion and control over the property. *See Konrad*, 730 F.3d at 349 (collecting cases). Here, Defendant provided no indication at the hearing that her husband would object to using the Haynesworth Property as security to obtain a home equity loan. *Cf. Barry*, 864 F.2d at 297 (noting that the defendant's wife objected to selling or encumbering their jointly owned residence). Moreover, the Haynesworth Property is unencumbered by any mortgage, and its value greatly exceeds the amount of Defendant's legal expenses in this Case. *Cf. Konrad*, 730 F.3d at 346 n.1 (noting that the defendant's home was not an available asset because it was subject to a $230,000.00 mortgage). Thus, at least at face value, the Haynesworth Property appears to be an available asset under § 3006A(f).

Nevertheless, the Court generally disfavors an interpretation of the CJA that would require a defendant to sell or mortgage her primary residence in order to reimburse the government for legal fees.[10] Additionally, though Defendant did not raise this issue at the hearing, the Court observes that the Haynesworth Property may be subject to the Texas homestead exemption, and therefore not within the purview of § 3006A(f). *See* Tex. Const. art.

---

[10] The weight of authority in other Circuits is in accord. *See Fincher I*, 538 F.3d at 878 n.4 (observing that most courts do not require a defendant to sell her homestead to facilitate the payment of defense costs); *Barry*, 864 F.2d at 300 ("A joint interest in a valuable equity in a family residence does not necessarily negate indigence for purposes of an accused's Sixth Amendment right to counsel."); *Perry v. Chief of Police of City of Marianna, Ark.*, 660 F. Supp. 1546, 1552 (E.D. Ark. 1987) ("The defendant may be required to liquidate certain assets, but should not be asked to give up his inexpensive car, or his home.") (internal citation omitted); *see also United States v. Trevino*, 679 F. Supp. 636, 636 (S.D. Tex. 1987) ("The Court doubts that the law would require these Defendants to actually sell their homestead to perfect an appeal.").

XVI, § 50; *see also* Tex. Prop. Code Ann. § 41.001(a) ("A homestead . . . [is] exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property.").[11]  For these reasons, the Court declines to base any reimbursement order on Defendant's ownership interest in the Haynesworth Property.

As noted above, however, the Haynesworth Property is not the only home that Defendant owns.  The Chapel Property is a $51,000.00 asset that Defendant owns free and clear of any mortgage.  And, though the Chapel Property is subject to $4,000.00 in back property taxes, the remaining value is more than sufficient to cover Defendant's expected legal expenses.

The status of the Wooldridge Property is more complicated.  According to Defendant, she owns the Wooldridge Property jointly with Nicolas Barraza, John Barraza, and Irene Barraza.  Tr. 61.  Defendant also testified that her siblings cannot agree on whether they should sell the Wooldridge Property in order to fund Defendant's legal defense.  *See id.* at 66-67.  While Defendant need not obtain the consent of her co-owners to liquidate or encumber her one-fourth interest in the Wooldridge Property, *see Shear Co.*, 276 S.W. at 936, the Court again acknowledges that the market value of Defendant's ownership interest is likely depressed by her siblings' refusal to sell or encumber the home.

However, despite the uncertainty surrounding the value of Defendant's interest in the Wooldridge Property, the Court finds that Defendant possesses more than sufficient assets to reimburse the government for the costs of her legal defense without suffering extreme financial hardship.  *See Museitef*, 131 F.3d at 716; *Bracewell*, 569 F.2d at 1199.  Indeed, Defendant's ownership interest in the Chapel Property is alone sufficient to cover her legal expenses in this Case, including the costs she is expected to incur on appeal.  Given that Defendant currently

---

[11] Because the Court does not have the requisite facts, and because Defendant never raised this issue in her briefing or at the hearing, the Court makes no finding as to whether the Texas homestead exemption actually applies in this Case.

allows her niece and her niece's husband to live in the Chapel Property rent free, Defendant can hardly claim that an order requiring her to either rent, mortgage, or liquidate the Chapel Property would result in extreme financial hardship.  In any event, the Court finds that it would not.  *See Konrad*, 730 F.3d at 348 ("The District Court properly ordered Konrad to pay the cost of court-appointed counsel, because Konrad's net financial resources exceed the amount needed for the necessities of life."); *see also Fincher II*, 593 F.3d at 707 (affirming district court's reimbursement order where, "[a]lthough there [was] no evidence that Fincher had the income and cash flow to pay for counsel, he had substantial assets other than his homestead – including the forty acres of non-homestead property, firearms, machinery, and tools – that he could have used to pay for his defense"); *United States v. Bedoya*, No. 89 CR. 803 (JMC), 1990 WL 194934, at *3 (S.D.N.Y. Nov. 28, 1990) (ordering reimbursement where "defendant's vague assertions concerning the status of his properties [were] clearly insufficient in view of the fact that he previously misrepresented the extent of his assets on his sworn financial affidavit"); *Thomas*, 630 F. Supp. at 822 (ordering reimbursement where the defendant had real estate assets with a value of over $200,000.00, and the approximately $173,000.00 he had in associated debts were "of his own making due to his failure to pay taxes for several years").

## III.    CONCLUSION

For the foregoing reasons, the Court hereby enters the following orders:

**IT IS ORDERED** that Defendant shall be entitled to retain her CJA appointed counsel during the pendency of her appeal.

**IT IS FURTHER ORDERED** that Defendant shall tender to the Clerk of this Court by no later than April 30, 2020, a check or money order in the amount of $24,256.05, which represents the total costs of Defendant's legal defense as of the date of this Order.

**IT IS FURTHER ORDERED** that Defendant shall tender to the Clerk of this Court by no later than April 30, 2020, a check or money order in an amount representing all costs, attorney's fees, and other expenses that Defendant incurs after the date of this Order in connection with her appeal.  For the purposes of reimbursement, Defendant's attorney's fees shall be calculated at the current CJA hourly rate.  If Defendant's appellate costs ultimately exceed $10,000.00, she may file a motion with this Court explaining why her then-current financial circumstances prevent her from repaying the excess amount.

**IT IS FURTHER ORDERED** that Defendant shall submit a proposed payment plan to this Court by no later than June 1, 2015.  The payment plan shall detail whether Defendant intends to satisfy the Court's reimbursement order by monthly installments, yearly installments, or by lump sum.  The Court has forwarded a copy of this Order to Defendant's probation officer, and Defendant may consult with her probation officer regarding the preparation of the payment plan.[12]

**IT IS FURTHER ORDERED** that the Clerk of the Court shall credit Defendant's payments to the Defender Services appropriation.

**SO ORDERED.**

SIGNED this 30th day of April, 2015.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE

---

[12] Defendant's compliance with this reimbursement is expressly *not* a condition of her probation.  *See United States v. Turner*, 628 F.2d 461, 467 (5th Cir. 1980).